Good morning, Runners. Lauren Regan for Plaintiff's Cascade Wildlands Project. If it pleases the Court, we understand that the Court has asked a question regarding the status of these sales, so I will touch on that first, although obviously the Forest Service and the intervener will probably have more up-to-date information than my clients, a public, non-profit environmental organization. Our understanding at this time is that the Blackberry timber sale is about 60% logged, but that hauling and other activities have not been completed at this time. We understand that Mike's Gulch, the other sale at issue, is completely logged at this time, and our logging of those trees is underway. However, there are other aspects of this project that were authorized within the Record of Decision, such as there are additional acreages, 18,900 acres of inventoried roadless areas that the Forest Service has given permission for logging. Is that in this case? Yes. And as of the last time we were in front of the Ninth Circuit, the Forest Service was unable to say that they were done logging. In that case, it was regarding late successional reserves, not the inventoried roadless areas. But even in the materials that the intervener submitted to the Court regarding the Governor's case in San Francisco, they still have not been able to conclusively state that this is it, that this is the end. And because the ROD does authorize additional activities, we are concerned that if this case was mooted as a result of the two timber sales that are on the chopping block right now, that in the next season there could be additional sales that were authorized. This additional 18,000 acreage, is that part of Blackberry, or is it part of Mike's Gulch, or is it an entirely different area? It is what is authorized within the record of decision. When this document was put out in 2004, it covers the entire inventoried roadless areas. And subsequent to this document coming out, there were two sales that were actually proposed by the Forest Service thus far. They have permission to log up into this maximum, but at this time they have only proposed this amount. Have they put that 18,000 up for sale? No other sales other than Blackberry and Mike's Gulch have been proposed at this time. But until the Forest Service says we're done, there are no further proposals, they have lawful authority to go forward with additional sales within these areas. But you're appealing the denial of the preliminary injunction as to the two parcels everybody's been talking about here, these two, Mike's Gulch and Blackberry. Well, our preliminary injunction used those two sales as the imminent harm, but there are additional harms that we did also indicate in our briefing. For instance, the fact that there is only less than 2 percent of inventoried roadless areas in the country. And so any diminishment of that amount is harm to the public. As well, we've brought up issues of replanting and prescribed burning, and many of the other issues that were promised but yet delivered on, those issues are still open to discussion and would also lead to harm as well. Right now, the Forest Service has indicated that they don't plan to do any of their prescribed burning until 2007. This was an essential mitigation matter that ties very closely to our argument of the increasing fire risk. Unless they go in and do these mitigation measures, the increased fire risk is exponential, and our experts in the studies we've submitted have documented that. That type of harm regardless of the actual logging will continue. Right. But the injunction that you're appealing from, though, is the denial of a preliminary injunction to stop the logging. Yes. And that's what's before us, is did the district court abuse his discretion in denying your request for injunction? Well, logging activities. You know, the case, even if we were to conclude that he didn't abuse his discretion, these other issues related to mitigation and whatnot, even if they cut down all the trees, could still support your argument that the case is the merits of the case are not mooted. You just go on and litigate that and eventually get a summary judgment ruling on that. That's right. We're just dealing here with the preliminary injunction. So maybe you should just tell us why you think the district court abused his discretion. Okay. Thank you. One of the primary reasons that we feel the district court abused its discretion is based on the specific ruling that they made, which was basically arguing or stating that the harm we alleged was de minimis. And the judge's ruling on this was to say, because these two sales are such a tiny part of this 500,000-acre project, that there was no harm. And we believe that that is incorrect and not based on the law. Regardless of how large the Forest Service proposes a project does not in any way reflect on what actual harm will occur from that logging. If it happened to be in an area of intense spotted owl activity, that harm would be very significant. Also, we did not feel that that dealt adequately with the issues on the table, which is, since 2002 and 2004, when the Forest Service came out with their decision, there has been a revolution in forest science on post-fire areas. The most recent scientific authority that the Forest Service relies on is from 1992. And when I explain this to people, I say, you wouldn't want a doctor using medical science from 15 years ago if they were going to do heart surgery on you. And we have some of the eminent scientists in forest ecology who have come out with an entire new area of research and study, much of it conducted within these timber sale areas themselves, that directly contradict much of the decision that was made. Okay, so let's, let me, you said a lot there. Spitting it out entirely. Yeah, really. So we review for abuse of discretion. And the district court is looking at the administrative agency also for arbitrary and capriciousness. So here the additional information was submitted to the agency. After the decision was made. So they got new supplemental, they got this new additional information, the studies that you're talking about. That's right. And, you know, the record shows that they considered those studies. Well, they issued an evaluation. Let me finish. The record shows that they considered those studies, and in fact, they issued two separate statements explaining why they weren't going to go ahead and do a supplemental environmental impact statement. Now, why was their decision arbitrary and capricious, or, you know, that you've at least raised a genuine, you've at least raised a, read the test. Genuine issue. No, no, no. Genuine issue. A serious question. Yes. I mean, you at least have raised a serious question in their decision, about their decision making process. Well, number one, we believe that that evaluation swept these serious issues under the rug and did not actually deal with them in a meritorious fashion. Part of that reason was this race to log before the rot would destroy the economic value of the trees. The second thing is, NEPA requires scientific controversy like this to be disclosed to the public. And we have science that is 180 degrees different from statements made by the decision maker in this case. And to give you a clear example of that, the decision maker said that it would take forever for conifer regeneration to occur in these areas. Our scientists say that about 50 to 85 percent of these areas are already fully stocked and have regenerated. The reason that's important is because if logging and other activities are allowed to occur, that natural regeneration would be destroyed. So not only do we think that the science was not dealt with adequately, but it wasn't dealt with in a NEPA context. And after the fact, evaluation by the agency does not meet the standards of NEPA in disclosing information. They decide first whether or not, in light of this new information that's brought to their attention, they have to decide whether or not it is sufficient that they're going to conduct an additional supplemental environmental assessment. Right. Isn't there some dispute in this whole area between the scientists about where things are scientifically, about regeneration? Not really. To be very frank, the Forest Service's interdisciplinary team leader, their overarching honcho for this project is our expert now. So we have Forest Service scientists as well as other very renowned scientists who state in these studies that the overwhelming consensus as published in major scientific journals on this topic state that everybody now has come around to the understanding that post-fire logging in a commercial sense like this is very, very damaging long term, and particularly in roadless areas. And I think that the roadless ruling that recently happened in San Francisco kind of points to that, which is these areas, less than 2 percent of what we have left, are incredibly important for habitat and for recreation and all of these other reasons. And whether you helicopter log it or whether you go in with a tractor and log it, that damage is done for hundreds of years and cannot be undone. And part of the reason that these reserves were set aside by Congress were to create further wilderness designations. When logging occurs, that will never happen. And that also goes to our harm argument, that we don't feel that the court adequately addressed. I'd like to reserve five minutes for rebuttal if possible. Good morning. May it please the court, I'm Lisa Jones from the Department of Justice, and with me at counsel table is Julie Weiss, who's counsel for the interveners. I will endeavor to take 13 minutes of the time and leave seven minutes for Ms. Weiss. I'd like to turn directly to the status of the sales and let the court know where things are, as you requested. With respect to the Mike Sculpey sale, Ms. Reagan is correct. All of the trees have been cut and they have been yarded. I mean, they've been moved to a place where they could be hauled. There is a limited... They've been stacked? Yes, they've all been stacked and yarded for Mike Sculpey. And I think, according to my Forest Service representatives, approximately five loads remain to be hauled on Mike Sculpey. Blackberry is a little further along than the appellants had noted. At this point, they're about... They expected that by today, the felling of the trees would be approximately 90% complete. Some yarding has occurred, not much. Some what has occurred? Yarding, moving the trees to a staging area to put them on trucks. Right. And they expect that hauling will occur, yarding and hauling. I think the yarding is supposed to continue at least for approximately a month, and hauling will continue into the spring. And cutting is continuing as of this moment? Cutting is around 90-95%. I think that Julie Weiss can tell you more about what her operator said as far as exactly the timeframe, but the prediction from the Forest Service was that by today it would be approximately 90-95% complete as far as the cutting of the logs. Taking a step back, I meant to say this first. These are the last salvage sales under the Biscuit Fire Recovery Project. The level of decay that was encountered at the Mike Sculpt sale, which ended up being smaller than they'd even anticipated, probably a third of the board feet that they'd expected to get out of it, came out of the sale given the level of decay. And there is no... These will be the last sales. So, I mean, I could provide the court with some type of declaration on that if you would like, but I asked that question specifically in response to this court's order, and I wanted a final answer on it, and I was given one. So the remaining portions of the project are the restorative portions that will continue, and those will continue for years. Based on these facts, I don't... The preliminary injunction appeal, as I read their complaint, sought to enjoin the advertisement sale and the logging operations on these sales. Even under those facts, it's moving towards mootness, but the appeal is probably not moot. As Judge Payaz, as you noted, of course, the merits of their claims, which can be briefed in front of the district court, that would not be mooted even if this court would agree that if the logging, if the cutting of the trees is over, that the preliminary injunction appeal, what they sought to enjoin, if there's no relief available for that particular portion of the PI appeal, that might be moot. Their case is not moot. I don't think their appeal is moot today. But there is a question, and this kind of moves towards the merits, and this may actually be a question that's best left for Judge Panner on summary judgment, is under the case that's most relevant to this court's consideration of the narrow NEPA claim here, whether a supplemental EIS was required. The Supreme Court's case in Marsh is the leading authority on how to assess when a supplemental environmental impact statement might be required and how to review an agency's decision whether or not to prepare that. And I would just point the Court to the court said that at some point a project will be so far along that it may not make any sense to prepare any supplemental document, because there's really no weighing that the agency could do. At the time the district court issued its decision, these sales had not been awarded. The Forest Service had self-stayed in order to permit the briefing to occur on this most recent challenge to the Biscuit Project. And there were other self-stays by the timber operators to permit other briefing within the context of the California Toilet Roll case, et cetera. So at that time, he didn't make a decision on whether we reached that point, but he may in the future. But the other relevant question that Marsh answered is, what do you review? And Judge Paez, you had pointed out that there were two evaluations, formal evaluations done by the Forest Service on all of the information that the plaintiffs submitted to the Forest Service. And the Supreme Court made very clear that the review of those decisions is to determine whether or not the agency made a clear error of judgment. And Judge Panner was very clear, and in fact, he said that the Forest Service looked at every piece of information and went through that information point by point and had no clear error of judgment. And that's at the excerpts of Record 367 to 368. And what this appeal is largely lacking is any attack on those findings by the agency. Now, you're talking about reasonable probability of success right now? Yes. I mean, this Court is looking to see whether Judge Panner abused his discretion in determining that. And primarily, his decision was based not on whether there was harm. He said his actual discussion of the size. On the harm prong of his analysis, he may well have been wrong. Well, actually, I would suggest that the appellants have overstated a bit what Judge Panner actually said with respect to harm. When he was talking about the size of the projects, he was talking about that within the context of likelihood of success on the merits. What he said is, what's not before me is this ideological debate between people on both sides of a fence, essentially. Should you or should you not do active management after a fire? Should you or should you not go into inventoried roadless areas where there's been a fire to take out dead trees? He said, that's not what's before me. What's before me are two small sales. That's what I have to assess. Mr. Jones, suppose we were to say that the district court did not abuse its discretion in determining that the plaintiff had failed to show a probable success on the merits because the Forest Service had not acted arbitrarily or capriciously in not preparing an SEIS or whatever it is, no reasonable probability of success. Suppose, however, there was irreparable harm. Are those two conjunctive or disjunctive, those two showings? Well, this Court has applied a sliding scale where you have ---- it would suppose you have no reasonable probability of success. But you do have irreparable harm. So you're saying, well, if they could win, or rather if they lose, they're going to suffer irreparable harm. But they have no reasonable probability of winning. Where does that leave us? Well, I think a good example of where that could leave you is exactly what the California district court did, and that was brought to your attention in a 28-day letter. There the Court found on a different legal claim actual success on the merits. And with respect to these two sales, again, and the balance of the harms to environmental groups that are also involved in some biscuit sales and one group that's involved here, the Court said, I'm not going to enjoin them because based on where they were in the process, the harms to the public interest, the harms to the Forest Service and to the intervenors, she did not enjoin them. So there still can be a balancing done, but even when there's actual success on the merits and someone has stepped forward and said there could be harm, that doesn't necessarily mean there needs to be an injunction. It's our position that they haven't really stated any harm beyond generally that if you cut down trees, that can be harmful. And I think in some circumstances, if you come forward with facts such as Ms. Hickman, if you were cutting down green trees and there was a spotted owl nest in the tree, it means something tangible. It's more than just cutting down the trees. It's the hauling and the yarding and the... Well, this is all being... It's more than just... When you say logging, it means more than just felling the trees. It does, but in this case, for these two particular sales, there's helicopter yarding, so these are... Don't they have to drag those trees? No, they pick them up. They have to be able to... They pick them up. And stack them someplace? They pick them up, take them to a specific place, and stack them. But there's no dragging. There's no ground-based logging systems. I mean, a lot of the harms that come from logging are based on tractor logging. And in this project, there is none and no tractor logging, not even any cable systems, which has some dragging, but much less. With helicopters, they are felled and they are picked up and carried away. And, in fact, for the whole biscuit project, there was five acres of tractor done, and that was done in matrix areas. The matrix and LSR sales are over. But can this destroy a habitat and, you know, affect all the animals in the area? Well, given... I'm assuming you're talking about... Because snags are... Snags are... Habitat, yes. What they call late successional reserves and so forth. Well, we could get into... The actual definition of a late successional habitat requires the trees be alive and certain patches, and where that occurred in the recovery area, there's no salvage. But here, what we have to remember with respect to snags is this fire created millions of snags, literally millions of snags. And originally, as the project was configured, on 96% of the recovery area, there was no salvage at all. It was very limited. Now it's 99.3%. There's no salvage that has occurred or will occur. And the limited salvage... I would point the court that the easiest place to look is to... There's a Fertig Declaration, which he attaches all of the relevant snag guidelines that are also in the EIS in Appendix G. And there was a very detailed way that the Forest Service went through to make sure that there are abundant snags. And, in fact, there's specific evidence in the EIS that the snag-dependent species, woodpeckers, et cetera, are the beneficiaries. And that's a quote from the EIS of this fire, even after any salvage has occurred. I'd like to turn briefly to the studies, which... It's our position that the appellants are overstating even what their own studies say. With respect to fire risk, none of these studies say that where you have limited salvage logging and you treat the slash, that there's going to be any risk of increased fire. It is undisputed that the EIS addressed this issue, commits to treat slash. And in Appendix B, and I apologize, the errata, which has some tables that are also helpful. I did not provide... Those are not in our excerpts, and I just realized that in preparing for argument. I can provide them. Tables that show that the slash levels are reduced because slash will be treated. And the suggestion that the Forest Service didn't look at any science after 1992 is directly refuted by the references in Appendix M of the EIS. And in fact, I could go through and tell you the Forest Service relied on numerous references that were relied on by these new studies, because some of these new studies were simply a survey of literature. And really what the case boils down to and the new information boils down to, and this is all within the evaluations, is that as an ideological matter, these plaintiffs don't want active management after a fire. And as an ideological matter, certain other folks think that you should leave everything to naturally regenerate. I'll give your colleague an extra. But I want to ask you, I have just one additional question. I get that there really is a debate in the science community in this area over, you know, how to deal with post-logging, post-fire salvage efforts. Is that right? The EIS says there is a debate. There is. The Forest Service believes that, and the EIS supports, in their view, for forest health reasons, particularly given, you know, basically a century of fire suppression management of national forests, that when you have a fire such as this, there are going to be some areas where you don't have seed trees. There are going to be some areas that five years down the road aren't going to be regenerating naturally. I mean, you've got to remember that 96 percent of this area is going to naturally regenerate. But in areas that were salvaged, where salvage was operated, and also in areas where there wasn't any salvage operations but perhaps where the fire was so severe there aren't any seed trees left, the Forest Service committed to go in and look and see if there is natural regeneration, if it's sufficient. They also want to make sure that they put in fire-resistant species of trees so that they can avoid, perhaps, a catastrophic fire in the future and put in disease-resistant Port Orford cedar and other things. So the Forest Service has taken the position that taking an active approach makes sense, but here we believe they balanced active versus passive, acknowledged that there's a scientific debate, reviewed all of the information that these plaintiffs put forward, and made a reasoned judgment. And there was no clear error of judgment under the standard for supplementing an EIS. Thank you. Thank you. We won't shortchange you, don't worry. Thank you. May it please the Court. My name is Julie Wise, and I represent the intervener appellees. With the Court's leave, interveners would make two points this morning, one regarding mootness and the second regarding the fact that the Court should uphold the district court's preliminary injunction decision. First, however, I will just say a little bit more about the status of these sales. You heard from Ms. Jones that Mike's Gulch is essentially done. There are about five loads of merchantable logs to be hauled out of the sale area. Those are logs that are decked. They have been yarded out of the forest. They are decked and just waiting to be hauled out of the forest. Now, how are you going to haul them out? With helicopters? No, they'll be hauled out of the forest with log trucks. So they've already been removed from the sale area via helicopter, placed in a landing, and now from the landing they'll be placed onto a truck, and the truck will travel over a graveled road and take those logs to a mill. Okay. And Blackberry? On Blackberry, the logging is approximately 90 percent done, and you're right, Your Honor, it's ongoing, so it's somewhere between 90 and 95 percent done. And when I say logging, I'm referring to the falling of the trees. It's proceeding at a little slower pace right now because the loggers actually work at the bottom of the sale area and then they move up the hill for safety reasons so that a log doesn't fall down the hill and injure a logger. Now that they're up at the top of the sale area, for safety reasons, fewer fillers can actually work in the area. So the remaining 5 to 10 percent of the sale will take about two weeks. That's the estimated time to complete the remaining 5 to 10 percent of the falling of the trees in Blackberry. Very little yarding has occurred yet, and the yarding is expected. It might actually go into December. Some of that is going to depend on the weather because the helicopter can't fly during fog or bad weather, but the hope is that by December, by mid-December certainly, that the trees will all have been yarded out of the sale area. The hauling likely will continue into spring, and the reason for that is because oftentimes in this part of the and there won't be anything that happens until springtime. So that is an idea of the status of the sales. The logger actually, Silver Creek, the timber company, has about $4 to $5 million invested in the trees that are on the ground in Blackberry right now. We don't have a declaration to show you for that, but this is just pursuant to the court's order asking for an update on the status of the sales. How much was that? Excuse me? How much invested? $4 to $5 million, about $1.5 million in direct investment, and about $3.5 million in helicopter costs, which ultimately would have to be paid regardless of whether those logs are removed from the forest and a return on that investment can be achieved. Before addressing my two points, I would like to address one point that Judge Thompson made, and that was the if there is no reasonable probability of success, what happens? And Judge Panner addressed that in his opinion, and he said, if there is no reasonable probability of success, if the plaintiffs are not going to prevail, then that's the end of the story. He did not have to do any balancing. And in addition to the case that Judge Panner cited, he referred to Far West Federal, which was a district court case. I believe also Sports Forum International is a Ninth Circuit case that stands for that proposition, and I apologize. I don't have that cite with me. But if there is no chance of prevailing on the merits, the inquiry can end at that point. But Judge Panner didn't end at that point. He went on and he looked at the harms and he looked at the public interest. So we ---- And he said there was a little chance, some small chance of success. That's right. He was reluctant to say that it was no chance whatsoever. And so he went ahead and engaged in the balancing. That's right, Your Honor. The two points I would like to make regard mootness and also the fact that this appeal is not moot should affirm the district court's opinion. And on the point of mootness, we agree with the Forest Service that it's important to look at ONRC, Marsh v. ONRC, the Supreme Court case that dealt with a supplemental EIS in the context of a dam. And in that case, the Supreme Court said that to supplement an EIS, two things have to be present. There has to be some remaining major Federal action, and there has to be new information that says there's going to be a significant effect on the human environment that was not considered, something different that was not considered in the original document. Arguably, on the facts of this case, as we have gone so far towards completion, we have reached a point where it is no longer reasonable to expect the Forest Service to supplement an EIS because it couldn't serve the purpose of informed decision making and informing the public. At some point from the beginning of a project to the end of a project, there will become a point at which supplementing an EIS simply is not applicable. And that is what the Court said in Marsh. And Judge Panner was aware of that. The argument was made to Judge Panner that perhaps this was a case in which it had gone so far in light of Cold Mountain v. Garber and the Sua case out of the Supreme Court, maybe this was a case where there was no Federal action left and it had gone so far that there could be no supplementation, and he said, no, there are some contracts to be let, there are other things to happen. But now we've gone farther. We have heard from the Forest Service that there will be no more timber sales. This we have what Judge Panner had before him was the 13th and the 14th of 14 sales. There will be no more sales, and arguably we have reached the point where it is moot in a sense because under Marsh we have reached the point where there's nothing to supplement. Well, it sounds like that's probably an issue. That's probably a determination for Judge Panner. You're right, Your Honor. And I do think that the preliminary the standards for preliminary injunction are a little bit different because it looks like it looks like the, you know, Blackberry, the logging is almost done or the felling is almost done. And that may well, you know, the need for injunctive relief may just be de minimis. You're absolutely, you're right, Your Honor. And that's an argument that would be made to Judge Panner. But I think it also is relevant in terms of thinking that an injunction has to be narrowly tailored. And even though just the fact that a timber sale is completed doesn't mean that the controversy immediately goes away. When you're talking about the need to supplement an EIS and the need to narrowly tailor injunctions, arguably, this is a different case from your standard timber sale case where there's a challenge to the adequacy of an environmental document or a challenge under the National Forest Management Act and you're concerned about the viability of the species. Here, what the plaintiffs, what Cascadia asked for was that the forest be compelled to prepare a supplemental EIS. And that's a different sort of case. But you're absolutely right. If this case, if the Court decides that this case is not moot and that there is a live controversy, then I would urge you to affirm the district court's preliminary injunction decision. This Court has held numerous times that the review of a preliminary injunction decision is afforded very limited and deferential review. And in this case, we demonstrated that the district court judge got the law right. That is, that is thoroughly briefed. And in terms of the balancing, the judge balanced the harm to going into one one-thousandth of the inventory roadless areas that were burned against some real public benefits in terms of jobs in an area where the economy is not doing so well, and the fact that there he felt as though the public interest would not be harmed and it might actually be benefited. So he didn't base his decision solely on the fact that it was de minimis. Because as the policy counsel mentioned, even a little tiny piece of a huge portion, he added on the other facts about the significant harm to the public, et cetera. Absolutely, Your Honor. He did. He looked at the harm that would befall the defendants, referring to both the Forest Service and the purchaser, if the sale were to be enjoined. And he also talked about the public interest in terms of jobs and furthering the economy in an area where that was important to the State of Oregon. So we would urge the Court to affirm the district court's opinion. Thank you. Ms. Weiss, before you go away, when these logs are laying on the ground, apparently the way they are in Blackberry and some of them in Mike's Gulch, if the injunction were to issue, and you say, well, you can't haul them away, what happens to the logs that are laying there? Do they disintegrate, or what happens to them? They would disintegrate eventually. They wouldn't be able to remain on a landing because that would cause a fire hazard. So the forest would have to find some monies to come in and remove those logs from the landings. They would not be able to just leave them there, and you certainly can't put them back into a forest because that would be deft. You would have to drag the logs back across the forest, I suppose. That's just not something you can do. If they're just left there, they're kind of like a bonfire stack before you light  Absolutely. Absolutely, Your Honor. How about the logs that are just down in the forest where they've just been felled? Are you asking, could they be left there? Yeah. Aren't they left there? I mean, what's wrong with just leaving them? They must, you know, just fall over and do course in any event. That's true. They would. Leave them on the forest ground, right? You certainly could do that, Your Honor, but we would urge you not to consider something like that because of the fact that there's No, I'm just, you know, you're talking about a landing. I took from your comment of a landing, that they had moved the logs to a landing in order to haul them, you know, to take them out of the forest. That's right. You're right. All of the trees that have been felled are dead trees, and so eventually they were going to fall anyway. At this point, there would be a very large input of dead trees on the ground, and there might be a safety hazard from that, but we would just urge the Court not to These are wilderness areas, right? No, it is not a wilderness area. A roadless area. It is a roadless area. Thank you. I'm sorry. Got to keep that straight. What's the difference between roadless? What's the difference between a roadless area and a wilderness area? Well, a roadless area is a reserve that was intended to be a future wilderness area, and this roadless area is actually adjacent to two wilderness areas, the North and South Kalmiopsis, and they're very, very world-renowned. They're world biological reserves and very, very prized. I wanted to start with the last comment that you were discussing regarding whether or not the lungs could be left on the ground, and the science we submitted, and I think the Forest Service would even agree, that large trees are the most fire-prone trees in the forest, and they are the best habitat and will go back into the soil and replenish it so that the soil will remain productive for generations. It is the small leaves and, well, not leaves, but branches and what they call fine fuels, that when logging occurs, that is what is being left on the forest floor, and that is what greatly increases the fire risk. So right now in Blackberry, they've taken the butt logs, meaning the most valuable large bottom parts of the trees, and they've left all of the tops on the ground, and they've done that in several other sales historically, including the Silver Fire, which occurred in the 80s in the same exact area. They never treated the slash, and it became a massive bonfire when this natural wildfire went through. If you look to our declaration of Rich Fairbanks, who is a former Forest Service head honcho of this project, you will see that he has said that it is unlikely that this slash will be treated appropriately, and that is part of why we are saying that regardless of what happens here, the increased fire risk from leaving these fuels behind will need to be dealt with regardless, or we're going to have a repeat of what has happened. I wanted to make a couple other comments. Number one, there is a tree, a rare cedar called the Porterford Cedar, that my opposing counsel mentioned. It is subject to a devastating fungus called Phytophthora lateralis. This disease is transferred by the hauling of trucks and logging equipment into areas. One of the main reasons that the environmental groups oppose logging in roadless areas is because those areas are pristine. They have not been encroached on by man. When man comes into these areas, the threat of these diseases also coming into these reserves is exacerbated. In previous biscuit logging, we have had the spread of Phytophthora lateralis into areas that never had it before. Once they come into a watershed, because it flows in water, it will be spread throughout that entire area, and we could lose that entire type of tree. The fact that there may have been logging done, but there is still hauling to commence, is a serious future harm, particularly because, as we've briefed numerous times now, the Forest Service has waived a restriction that was in place that forbid them from logging and hauling in the wet season, which basically is any time between June and September 1. So starting September 1, the wet season started, and of course, in Oregon, especially in this mountain area, we're getting a lot of rain and the start of snow right now. The fact that they are going to continue to haul trees out of these areas is a continuing threat that we would like to have addressed. Also, I wanted to point out that there is a fifth record of decision that is still to come out in this sale. Within the records of decision that have come out so far, the agency official, Scott Conroy, says, I'm going to issue a total separate record of decision dealing with prescribed burning, FMZ construction, which is the fire breaks that they are proposing, and some other factors, mostly geared toward mitigation and restoration. So we have this promised separate and additional decision that we have yet to see, and so there are actions that may come up that the science that we're asking the court and the agency to consider will become relevant again, particularly because our primary claims are what's going to happen with regeneration, what's going to happen with the tree planting, and what's going to happen with the increased fire risk. These are the bases that the agency sold to the public as why we needed this commercial logging in areas where commercial logging had never before occurred. And so if they can't prove that this action is going to actually do what they said it was going to do, we think that this new science is a very integral part to that. And because of that, we believe that there will be a live controversy. And finally, I wanted to just point out that there is a lot of case law that we've included in our briefing that says that the economic short-term harm to the timber industry or to the government does not weigh as heavily as permanent ecological harm to species and the habitat and the environment, and not to mention the harm that occurs if a procedural error has occurred in the NEPA process. So regardless of whether it's 90% or 95% logged, we do still believe, and like you did mention, it may be issues on the merits for Judge Panner, but we do believe that there are still a lot of unknowns on this table and there are a lot of decisions that can still be prevented from continuing the harm that we believe will occur. Thank you. Thank you, Counsel. We appreciate your arguments in this case. Very helpful. And the matter will be submitted and will be in recess until tomorrow. Well, I'd like to add, I think this case was especially well argued on both sides.
judges: D. Nelson, Thompson, Paez